19-2585 BPG   19-2586 BPG   19-2587 BPG   19-2588 BPG
19-2589 BPG   19-2590 BPG   19-2591 BPG   19-2592 BPG
19-2593 BPG   19-2594 BPG   19-2595 BPG

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Colleen Daly, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, declare and state as follows:

**SEALED**

FILED        ENTERED
                          RECEIVED
AUG 06 2019
              AT BALTIMORE
CLERK, U.S. DISTRICT COURT
BY            DISTRICT OF MARYLAND
                          DEPUTY

### INTRODUCTION

1.     This affidavit is made in support of a criminal complaint charging **SONNY SPENCER, CEASAR VAUGHAN, ARNOLD SMITH, GILBERT DODD, AMEER SMITH,** and **MARLOWE HARVARD** (collectively, the "**TARGET SUBJECTS**") with (a) distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); and (b) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846 (collectively, the "**SUBJECT OFFENSES**").

2.     This affidavit is also made in support of a search and seizure warrant authorizing the search of the following locations and vehicles (collectively, the "**SUBJECT PREMISES**" and "**SUBJECT VEHICLES**") described more fully in Attachment A-1 to A-8 for the items described in Attachment B:

a.     419 Furrow Street, Baltimore, Maryland 21223 ("**SUBJECT PREMISES 1**"), is associated with **VAUGHAN** and believed to be a location that the **TARGET SUBJECTS** use to store narcotics. The premise is a two-story tan and gray brick row house with a black front storm door with a solid white door behind it. The numerals "419" are displayed on the right of the front door.

b.     639 S. Pulaski Street, Baltimore, Maryland 21223 ("**SUBJECT PREMISES 2**"), is believed to be the current residence of **SPENCER**. The premises is a two-story red brick row house with a white storm door and a white door behind it. The numerals "639" are displayed to the left of front door.

19-2596 BPG     19-2598 BPG     19-2599 BPG

BKM

c.      2903 Lakebrook Circle, Apt. 303, Lansdowne, Maryland 21227 ("**SUBJECT PREMISES 3**"), is believed to be the current residence of **VAUGHAN**.  The premises is an apartment in a building located at 2903 Lakebrook Circle with a front and back entrance.  Apartment 303 is located on the third floor and has a beige door with the number 303 on it.

d.      4109 Stokes Drive, Apt. 4, Baltimore, Maryland 21229 ("**SUBJECT PREMISES 4**"), is believed to be the current residence of **ARNOLD SMITH**.  The premises is an apartment in a building located at 4109 Stokes Drive with a front entrance.  Apartment 4 has a brown door with the number 4 on it.

e.      2015 BMW X3 bearing Maryland registration 4DP0981 and VIN# 5UXWX9C5XF0D44561 ("**SUBJECT VEHICLE 1**") which is believed to be used by **SPENCER**.

f.      2006 Infiniti G35 Coupe bearing Maryland registration 5DT9236 and VIN# JNKCV54E66M708173 ("**SUBJECT VEHICLE 2**") which is believed to be used by **VAUGHAN**.

g.      2005 Honda Accord bearing Maryland registration 6DW1328 and VIN# 1HGCM82675A011940 ("**SUBJECT VEHICLE 3**") which is believed to be used by **ARNOLD SMITH**.

h.      2010 Mercedes C300 bearing Maryland registration 4DP0978 and VIN# WDDGF8BB0AF408948 ("**SUBJECT VEHICLE 4**") which is believed to be used by **SPENCER**.

## AFFIANT'S BACKGROUND

3.      I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.      I am a Special Agent with the ATF and am currently assigned to a joint task force of ATF agents and detectives from the Baltimore Police Department ("BPD"). I have been employed by the ATF since 2017. I hold a dual bachelor's degree in criminology and sociology from Immaculata University. I have participated in multiple investigations focusing on drug trafficking, gangs, and illegal firearms. I have conducted covert surveillance of suspected drug traffickers, interviewed several individuals involved in gangs and the drug trafficking trade, served as a member of surveillance teams, participated in the execution of state and federal search and arrest warrants involving drug traffickers and violent offenders, and participated in the seizure of illegal drugs.

5.      This investigation is being conducted by the ATF. I have personally participated in this investigation and make this affidavit based on my personal participation in this investigation and on reports made by other law enforcement agents, as well as confidential informants discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have reviewed. Such statements are reported in substance and in part, unless otherwise

3

indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Not all of the facts of the investigation known to me are contained in this affidavit, only those necessary to establish probable cause for the stated offense.

**EVIDENCE OF DRUG TRAFFICKING
BY THE TARGET SUBJECTS**

**A.     METHODS AND MEANS OF DRUG TRAFFICKING**

6.     Through training and experience in drug trafficking investigations and arrests, I have become familiar with the actions, traits, habits, and terminology used by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellphones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

7.     Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses. Drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity;

8.     Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell. In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization;

9.     Cellphones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellphones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and

4

similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators. In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

10. Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

11. Drug traffickers often arm themselves and their organization to protect their drug trafficking activities from rival drug traffickers.

12. Drug traffickers keep controlled substances, as well as paraphernalia (to include packaging materials, scales etc.) in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses.

13. Drug traffickers frequently keep and maintain records of their various activities. Such records frequently are kept to keep track of money owed to them by other drug traffickers and money that they owe to drug suppliers, and to maintain contact information for other drug traffickers and suppliers. Experience in similar cases has established that such records are frequently concealed in a suspect's residence and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, various forms

of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers and where they have ready access to them, such as safety deposit boxes, their residences, in their vehicles and on their person.

14.     Drug traffickers, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above.

15.     Drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities.

16.     Drug traffickers frequently use cellphones and other electronic communications devices to facilitate illegal drug transactions. A suspect's possession of a cellphone with a certain call number (or electronic serial number) identified during the investigation is evidence that that suspect is the user of the cellphone and constitutes evidence of the suspect's participation in the conspiracy. Likewise, documents referencing the possession or use of cellphones, such as bills, cellphone boxes, receipts for phones or payment, etc., are of evidential value insofar as their evidence of a suspect's possession of a particular phone. Moreover, the electronically stored information on

6

these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals. I know that drug traffickers often keep in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, cellphones and documents referencing the possession of those phones.

17.     Drug traffickers frequently take or cause to be taken photographs of themselves, their associates, their proceeds, and their narcotics. Drug traffickers commonly have such photographs in their residences, vehicles, places of work, electronic devices, or on their person. In a criminal conspiracy case such as this, photographs of co-conspirators with one another is evidence of their association with one another and thus can be used as evidence of their participation in a common conspiracy.

18.     Drug traffickers commonly have in their possession -- that is, on their persons and in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses-- firearms and other weapons, which are used by the traffickers to protect and secure their narcotics and proceeds from loss to law enforcement agents or to other criminals who may attempt to steal money and drugs.

**B.     CASE BACKGROUND**

19.     The ATF has been investigating a loosely formed group of individuals believed to be operating a drug trafficking organization that operates in and around the 400 block of Furrow Street, in southwest Baltimore City, Maryland (hereinafter the "DTO"). The DTO distributes primarily crack cocaine, heroin, and fentanyl. Based on evidence gathered to date through

7

surveillance, confidential informants, and other sources, I believe that **SPENCER** (associated with **SUBJECT PREMISES 2**, **SUBJECT VEHICLE 1**, and **SUBJECT VEHICLE 4**) is the leader of the DTO and that the other **TARGET SUBJECTS** are members of the organization. Based on evidence gathered to date, I believe that **VAUGHAN** (associated with **SUBJECT PREMISES 3** and **SUBJECT VEHICLE 2**) and **ARNOLD SMITH** (associated with **SUBJECT PREMISES 4** and **SUBJECT VEHICLE 3**) are more senior members of the DTO. I believe that **DODD**, **AMEER SMITH**, and **HARVARD** are retail drug sellers for the DTO.

C.   **INFORMATION FROM CONFIDENTIAL SOURCES**

20.   As part of this investigation, on May 8, 2019, investigators interviewed a confidential source of information, hereinafter CS-1, about the activities of the DTO. CS-1 explained to investigators that **VAUGHAN** and **SPENCER** are drug traffickers who sell large quantities of narcotics in the 300 and 400 block of Furrow Street in Baltimore City. CS-1 stated **VAUGHAN** and **SPENCER** would make approximately $5,000 per day selling narcotics.[1]

21.   CS-1 reported that he/she had seen **VAUGHAN** and **SPENCER** with as much as approximately one ½ ounce of crack-cocaine in the past. CS-1 stated **VAUGHAN** and **SPENCER** are "calling the shots", meaning that **SPENCER** and **VAUGHAN** lead and make all decisions involving the DTO. CS-1 stated **VAUGHAN** and **SPENCER** used different names for their narcotics, such as "White House" or "Illuminati" to differentiate and promote their narcotics from other drug shops. CS-1 observed **VAUGHAN** and **SPENCER** selling 25 to 50 "packs" of narcotics

---

[1] The confidential source of information has been providing information to law enforcement for several months. In that time the information provided has been corroborated to the extent possible and proven reliable. The confidential source has interacted with **SPENCER** and the **TARGET SUBJECTS**, is familiar with the drug trade in Baltimore City and is familiar with the activities of the DTO in the 400 block of Furrow Street. The confidential source has a criminal record and is providing information to law enforcement in exchange for consideration in pending criminal matters.

per day. I know based on my training, knowledge and expertise that a "pack" of narcotics typically contains 25 individual, retail units of narcotics. CS-1 explained that the "hitters", DTO members who are selling the narcotics to buyers, would make approximately $100.00 per day, and would sell 15 to 20 packs of narcotics per day.

22.     CS-1 stated that **VAUGHAN** provided a firearm to an individual to stash in the target area. The confidential source recalled a shooting that occurred in the 400 block of Furrow Street. The confidential source recalled that during that incident **VAUGHAN**, **SPENCER**, and other DTO members retrieved firearms from an alley, and fired them at a rival DTO.

**D.     CONTROLLED PURCHASES OF NARCOTICS**

23.     As part of this investigation, between February and July 2019, a confidential informant ("CI")[2] and an undercover ATF agent ("UC") made controlled purchases of crack cocaine from the **TARGET SUSPECTS** in and around the 400 block of Furrow Street.[3] Based on the observations of the CI and the UC, the manner in which these transactions were conducted, their close proximity to each other, and the way in which different suspects at different times, working in different combinations conducted these sales, I believe that the **TARGET SUBJECTS** are working together to distribute crack cocaine in the 400 block of Furrow Street. Each of these controlled purchases is described in more detail below. Given the alternating combinations of suspects involved in each transactions, they are listed here in chronological order.

---

[2] The CI is an ATF registered confidential informant. The CI has purchased illegal drugs for personal use in the past and therefore knows how illegal drugs are bought, packaged, sold, and used. The CI has provided members of law enforcement with accurate information relative to illegal drugs in the past, which has been corroborated, to the extent possible, through investigation. The CI has also successfully conducted controlled purchases under the direction of members of law enforcement. The CI is working for monetary compensation.

[3] These controlled purchases were audio and video recorded. Investigators have reviewed these recordings.

24.     On February 14, 2019, at about 12:48 p.m., the CI entered the 400 block of Furrow Street and told **HARVARD** that he/she was interested in purchasing "ready" (a common term in Baltimore for crack cocaine). Because the CI requested a larger quantity of "ready" than what **HARVARD** had on hand, **HARVARD** said that he had to go and get more. **HARVARD** left the block and, upon returning, gave 22 purple plastic jugs containing what was tested and found to be cocaine base to the CI in exchange for $100. Investigators saw **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 2** (bearing a previous Maryland registration) parked in the 400 block of Furrow Street at the time of the sale.

25.     On March 14, 2019, at about 11:58 a.m., the CI entered the 400 block of Furrow Street and told **ARNOLD SMITH** that he/she wanted to buy "stones" (a common term in Baltimore for crack cocaine). **ARNOLD SMITH** directed the CI to **DODD** and another person, who were on the next block. **DODD** gave 10 blue top vials containing what was tested and found to be cocaine base the CI in exchange for cash. After the sale, the CI returned to **ARNOLD SMITH** and asked for an additional quantity of crack cocaine. **ARNOLD SMITH** again directed the CI to **DODD** to complete the sale, and **DODD** gave the CI 6 blue top vials containing what was tested and found to be crack cocaine in exchange for cash. The CI bought a total of 16 blue top vials of crack cocaine for $100. Investigators saw **SPENCER** drive **SUBJECT VEHICLE 1** into the 400 block of Furrow Street around the time of the sale. After the sale, the CI told investigators that he/she saw **SPENCER** directing DTO members around during the sale.

26.     On March 20, 2019, at about 11:43 a.m., the CI made a recorded phone call to **ARNOLD SMITH** and arranged to buy more crack cocaine. Shortly afterward, the CI approached **DODD** at the corner of Furrow and Ramsay Streets and asked to buy crack cocaine. **DODD** gave 11 blue top vials containing suspected crack cocaine to the CI and directed him/her to another

10

person, who then gave 5 green top vials containing suspected crack cocaine to the CI in exchange

for $100. A few minutes after the sale, investigators saw **SPENCER** enter the 400 block of Furrow

Street in **SUBJECT VEHICLE 1**.  Investigators also saw **SUBJECT VEHICLE 2** (bearing a

previous Maryland registration) parked around the corner, in the 2200 block of Ramsay Street.

27.     On April 17, 2019, at about 1:45 p.m., the CI entered the 400 block of Furrow Street

and approached a group of people that included **SPENCER, ARNOLD SMITH, AMEER**

**SMITH**, and others.  The CI asked for "ready." **ARNOLD SMITH** directed a DTO member to

complete the sale in a nearby alley, where that DTO member gave 20 green top vials containing

what was tested and found to be cocaine base to the CI in exchange for $100.  Afterward,

**ARNOLD SMITH** authorized the DTO member to give the CI an extra green top vial containing

what was tested and found to be cocaine base.  Investigators saw **HARVARD** and **DODD** in the

400 block of Furrow Street around the time of the sale.

28.     On April 24, 2019, at about 2:00 p.m., the CI approached **DODD, AMEER**

**SMITH**, and **VAUGHAN** in the 400 block of Furrow Street and asked **VAUGHAN** for "hard" (a

common term in Baltimore for crack cocaine). **VAUGHAN** directed the CI to a different location

to finish the sale.  Eventually, the CI confirmed the desired quantity with **AMEER SMITH**, who

stood with a DTO member as that member gave 20 black top vials of what was tested and found

to be cocaine base to the CI in exchange for $100. **HARVARD** can be seen in the 400 block of

Furrow Street in the video recording of the sale.

29.     On May 1, 2019, at about 2:13 p.m., the CI entered the 400 block of Furrow Street,

approached **VAUGHAN, DODD**, and another person, and told them that he/she was interested in

buying 30 vials of "hard." **VAUGHAN** entered **SUBJECT PREMISES 1** and returned with 18

vials, then entered **SUBJECT PREMISES 1** again and returned with the remaining vials.

11

**VAUGHAN** then gave 31 black top vials of suspected crack cocaine to the CI in exchange for $150. **ARNOLD SMITH** arrived on the block and spoke to the CI during the sale. Investigators also saw **SPENCER** drive **SUBJECT VEHICLE 1** onto the block and speak with DTO members.

30.      On May 9, 2019, at about 1:04 p.m., the CI entered the 400 block of Furrow Street and told several DTO members, including **DODD**, that he/she was interested in buying 30 vials of "hard." **DODD** directed the CI to a group of DTO members, one of whom gave 30 yellow top vials of suspected crack cocaine to the CI in exchange for $150. Investigators saw **SPENCER** on the block before the sale. When the CI inquired about buying an "eight ball" (a common term in Baltimore for an eighth of an ounce) of crack cocaine, a DTO member pointed at **SPENCER** and directed the CI to ask "Bleezy" (investigators know that "Bleezy" is one of **SPENCER's** nicknames). Investigators also saw **VAUGHAN** grab something from a car and walk into **SUBJECT PREMISES 1**.

31.      On May 16, 2019, at about 1:06 p.m., the CI entered the 400 block of Furrow Street and spoke to **VAUGHAN** about buying an "eight ball" of crack cocaine. **VAUGHAN** told the CI how to package and price that quantity for individual sales. The CI then told **VAUGHAN** that he/she was interested in purchasing 40 vials of crack cocaine. **VAUGHAN** entered and exited **SUBJECT PREMISES 1** before handing 35 vials containing suspected crack cocaine to the CI. To complete the sale, **AMEER SMITH** gave 5 vials containing suspected crack cocaine to the CI. In total, the CI purchased 40 yellow and green top vials containing suspected crack cocaine for $200. Investigators saw **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 2** parked in the 400 block of Furrow Street before the sale.

32.      On June 6, 2019, at about 11:40 a.m., the CI entered the 400 block of Furrow Street and discussed purchasing an "eight ball" of crack-cocaine with **VAUGHAN**. **VAUGHAN** told the

CI that he had larger packaged vials of crack-cocaine that the CI could make double his price re-selling. At this time, the CI and **VAUGHAN** walked to the 300 block of Furrow Street, near **SPENCER** and other DTO members. While walking, **VAUGHAN** exclaimed, "white chocolate, straight, and hard," all nicknames for the narcotics the DTO sold. During the drug transaction that was directed by **VAUGHAN**, the CI dropped a vial from his/her hand. The vial fell to the pavement, to which **SPENCER** told the CI he/she dropped a vial. **SPENCER** asked the CI if it cracked. **SPENCER** also told the CI that the vial on the ground was his/her money on the ground. **SPENCER** then found an empty cigar bag on the pavement, picked it up, and gave it to the CI so that the CI could contain the 29 vials purchased in exchange for $200.00.

33.     On June 12, 2019, at about 11:46 a.m., the CI entered the 400 block of Furrow Street and discussed purchasing an "eight ball" of "hard" with **ARNOLD SMITH**. **ARNOLD SMITH** directed the CI to speak with **VAUGHAN**. They walked to meet **VAUGHAN** at **SUBJECT PREMISES 1**. **VAUGHAN** came outside and told the CI that they did not have "hard" at the moment, but the CI could return later. After the CI left the area, **SPENCER** and **ARNOLD SMITH** drove **SUBJECT VEHICLE 1** from the 400 block of Furrow Street to **SUBJECT PREMISES 2** and went inside. **DODD** also left the block and entered **SUBJECT PREMISES 2**. About a half hour later, investigators saw **DODD** leave **SUBJECT PREMISES 2** and place what appeared to be packs of narcotics behind a piece of plywood near a vacant home on the 300 block of Furrow Street. **DODD** then handed out what appeared to be packs of narcotics to other DTO members, who then, in turn, engaged in what appeared to be suspected hand-to-hand drug transactions. At about 1:42 p.m., the CI called **VAUGHAN**'s cellphone. **VAUGHAN** said that the CI's order was ready. The CI returned to the 400 block of Furrow Street, and a DTO

13

member gave a clear plastic bag containing suspected crack cocaine, weighing about 3.1 grams with packaging, to the CI in exchange for $130.

34.    On June 25, 2019, at about 2:45 p.m., the CI and an undercover ATF agent (hereinafter the "UC") drove to a McDonald's parking lot in Baltimore to complete a purchase of suspected crack cocaine.  About 20 minutes later, **ARNOLD SMITH** arrived in **SUBJECT VEHICLE 3**.  **ARNOLD SMITH** entered the passenger seat of the UC's vehicle and gave a clear plastic bag, wrapped in a brown napkin, containing about 21.8 grams of unpackaged suspected crack cocaine to the UC in exchange for $1,000.  **ARNOLD SMITH** returned to **SUBJECT VEHICLE 3** and drove directly to the corner of Furrow and Ramsay streets.

35.    On June 27, 2019, from about 11:00 a.m. to 12:06 p.m., the UC called and exchanged text messages with **ARNOLD SMITH** to arrange another purchase of unpackaged crack cocaine.  Investigators saw **ARNOLD SMITH** leave the apartment complex of **SUBJECT PREMISES 4** and catch a ride to the same McDonald's parking lot, where the UC was parked. **ARNOLD SMITH** entered the passenger seat of the UC's vehicle and gave a clear plastic bag containing about 13.4 grams of unpackaged suspected crack cocaine to the UC in exchange for $550.  The UC and **ARNOLD SMITH** discussed buying an additional quantity of crack cocaine before **ARNOLD SMITH** departed the parking lot and caught a ride to the corner of Furrow and McHenry Streets, the northern side of the block opposite the intersection of Furrow and Ramsay Streets.

36.    On July 31, 2019, at about 1:30 p.m., the UC drove to the McDonald's parking lot in Baltimore to complete a purchase of suspected crack cocaine.  The UC waited for approximately 15 minutes when, **ARNOLD SMITH** and **SPENCER** arrived in **SUBJECT VEHICLE 4**. **ARNOLD SMITH** entered the passenger seat of the UC's vehicle. **ARNOLD SMITH** reached

down to his ankle and retrieved a clear plastic bag, containing about 27.8 grams of unpackaged suspected crack cocaine to the UC. The UC then asked **ARNOLD SMITH** if he had any heroin and fentanyl for sale. **ARNOLD SMITH** stated he did, but he would have to go get it. At this time the UC told **ARNOLD SMITH** s/he would wait while **ARNOLD SMITH** retrieved it. **ARNOLD SMITH** exited the UC's vehicle and re-entered **SUBJECT VEHICLE 4**. **SUBJECT VEHICLE 4** left the McDonald's parking lot, and drove to the 400 block of Furrow Street.

37.    **ARNOLD SMITH** was observed exiting **SUBJECT VEHICLE 4** and entering **SUBJECT PERMISES 1**. **ARNOLD SMITH** exited **SUBJECT PREMISES 1** and got back into **SUBJECT VEHICLE 4**. **SPENCER** and **ARNOLD SMITH** then drove **SUBJECT VEHICLE 4**, to **SUBJECT PREMISES 2**. **SPENCER** and **ARNOLD SMITH** both exited the vehicle, and entered the residence. Within approximately two minutes, **SPENCER** and **ARNOLD SMITH** entered **SUBJECT VEHICLE 4** and drove back to the McDonald's parking lot, where the UC remained.

38.    The UC observed **SPENCER** and **ARNOLD SMITH** within **SUBJECT VEHICLE 4**. The UC saw **SPENCER** counting money, while **ARNOLD SMITH** entered the UC's vehicle. **ARNOLD SMITH** and the UC conducted the drug transaction for 7.21 grams of suspected heroin/fentanyl. **ARNOLD SMITH** had to provide the UC with change for a $100.00 bill. At this time, **ARNOLD SMITH** told the UC, that he would have to see if **SPENCER** had change. **ARNOLD SMITH** exited the UC vehicle and entered **SUBJECT VEHICLE 4**. The UC observed **SPENCER** and **ARNOLD SMITH**, inside the vehicle counting money. **ARNOLD SMITH** then exited **SUBJECT VEHICLE 4** to give the UC his change. After the transaction, **SUBJECT VEHICLE 4** departed the McDonald's and drove in the direction of the 400 block of Furrow Street.

### D.   SURVEILLANCE

39.   As part of this investigation, investigators have conducted surveillance of the **TARGET SUBJECTS** in and around the 400 block of Furrow Street as well as at their suspected residences.   As a result of this surveillance investigators have seen **SONNY SPENCER, CEASAR VAUGHAN, ARNOLD SMITH, GILBERT DODD, AMEER SMITH**, and **MARLOWE HARVARD,** regularly in and around the 400 block of Furrow Street interacting with each other and helping other DTO members conduct what appears to be, based on investigators' training, knowledge, and expertise, numerous hand-to-hand drug transactions. Investigators conducted surveillance of the **TARGET SUBJECTS** at 400 Furrow as recently as July 30, 2019.   Given the close proximity of this drug activity and the way in which the **TARGET SUBJECTS** interact and appear to coordinate with each other, I believe, based on my training, knowledge, and expertise, that the **TARGET SUBJECTS** are working together to operate an open-air retail drug operation in the 400 block of Furrow Street.   In addition, investigators have also seen some the **TARGET SUBJECTS** regularly travel between some of the **SUBJECT PREMISES** and the 400 block of Furrow Street, oftentimes using one of the **SUSPECT VEHICLES**.   Specifically, investigators have observed the following:

40.   On February 13, 2019, at about 10:00 a.m., investigators saw **SUBJECT VEHICLE 1** parked in front of **SUBJECT PREMISES 2**.   Over the next two hours, investigators saw several people, including **VAUGHAN**, walk into the house.   They also saw a person, later identified as **DODD**, leave the house and walk away.   At about 1:22 p.m., investigators saw two people leave **SUBJECT PREMISES 2** and put large black plastic bags into **SUBJECT VEHICLE 1**.   **SPENCER** left **SUBJECT PREMISES 2** and drove **SUBJECT VEHICLE 1** to the 400 block of Furrow Street, where a person removed a small black plastic bag from the car.

41.     On April 11, 2019, at about 10:00 a.m., investigators saw a white female making what appeared to be hand-to-hand drug transactions in the 400 block of Furrow Street.  As suspected drug buyers entered the block, the white female directed them to an area out of view of investigators.  The buyers often counted cash as they entered the area.  The white female followed them, and the buyers would reemerge from the area moments later and leave the block.  At about 10:30 a.m., investigators saw **VAUGHAN** leave **SUBJECT PREMISES 1** and hand the white female a clear plastic bag containing objects consistent with the shape and size of street-level narcotics.  The white female returned to the area where she was directing buyers.  I believe that **VAUGHAN** supplied the white female with more narcotics to sell.  By about 10:45 a.m., **SPENCER** arrived in the 400 block of Furrow in **SUBJECT VEHICLE 1**.  **SPENCER** and **VAUGHAN** were seen walking and talking together.  At about 12:00 p.m., investigators saw **VAUGHAN** receive cash from the white female.  At about 1:00 p.m., they also saw **SPENCER** receive cash from the white female.  Based on my training, knowledge and expertise I believe this constituted proceeds of drug sales on the block.  At about 12:43 p.m., investigators saw **SPENCER** drive **SUBJECT VEHICLE 1** to the same block as **SUBJECT PREMISES 2** but enter a different house on the block.  At about 1:05 p.m., **SPENCER** and **VAUGHAN** were seen together again in the 400 block of Furrow Street.

42.     On May 14, 2019, at about 8:09 a.m., investigators saw **VAUGHAN** and a black female leave the apartment complex of **SUBJECT PREMISES 3**.  **VAUGHAN** entered **SUBJECT VEHICLE 2**.  Investigators saw **VAUGHAN** and **SUBJECT VEHICLE 2** in the 400 block of Furrow Street a short time later.  Using a pole camera, at about 8:22 a.m., investigators saw **SPENCER** arrive at **SUBJECT PREMISES 2** in **SUBJECT VEHICLE 1**.  A few minutes later, **SPENCER** drove **SUBJECT VEHICLE 1** to the 400 block of Furrow Street.

17

43.     On May 22, 2019, at about 9:22 a.m., investigators, using a covert video recording device, saw **VAUGHAN** leave the apartment complex of **SUBJECT PREMISES 3**. He drove **SUBJECT VEHICLE 2** to the 400 block of Furrow Street. Between 9:40 a.m. and 11:17 a.m., investigators saw **VAUGHAN** enter and leave **SUBJECT PREMISES 1** at least five times. In between those times, **VAUGHAN** interacted with potential buyers who appeared to be on the block for suspected narcotics transactions, spoke with drivers who arrived in the block in cars, and engaged with other DTO members. At about 10:09 a.m., **SPENCER** arrived in the block in **SUBJECT VEHICLE 1** and threw a black bag into its rear seat. After briefly speaking with **VAUGHAN**, **SPENCER** drove away. At about 12:23 p.m., **SPENCER** picked up **ARNOLD SMITH** at **SUBJECT PREMISES 2** and drove him in **SUBJECT VEHICLE 1** to the 400 block of Furrow Street. By 12:50 p.m., **SPENCER**, **VAUGHAN**, and **ARNOLD SMITH** were seen together in the block.

44.     On June 5, 2019, beginning at about 8:45 a.m., investigators saw **SPENCER**, **VAUGHAN**, **DODD**, and other DTO members around the 400 block of Furrow Street while other DTO members engaged in what appeared to be hand-to-hand drug transactions in the area. Investigators saw DTO members grab suspected narcotics from a mailbox attached to a row home at 328 Furrow Street and exchange the suspected narcotics with unknown buyers for cash. Between the suspected sales, one DTO member walked to a row home at 316 Furrow Street, grabbed a black plastic bag from the doorway entrance, removed a bundle of what appeared to be gel caps of suspected narcotics, and then put the black plastic bag back in the doorway entrance after handing the gel caps to another DTO member. At about 10:10 a.m., a BPD detective entered the 300 block of Furrow Street and recovered 1 clear plastic bag with 14 pink top vials containing suspected crack cocaine, 1 clear plastic bag with 31 gel caps containing suspected heroin, 1 clear

plastic bag with 100 gel caps containing suspected heroin, and 1 clear plastic bag with 50 pink top vials containing suspected crack cocaine from the mailbox attached to 328 Furrow Street and the doorway entrance of 316 Furrow Street.

**E.      CONCLUSION**

45.      Based on the facts set forth above, there is probable cause to believe that **SONNY SPENCER, CEASAR VAUGHAN, ARNOLD SMITH, GILBERT DODD, AMEER SMITH,** and **MARLOWE HARVARD** are members of a drug trafficking organization selling crack cocaine to retail customers in Baltimore City.

**THE SUBJECT PREMISES AND VEHICLES**

46.      Additionally, there is probable cause to believe that, contained within the **SUBJECT PREMISES** and the **SUBJECT VEHICLES**, there is currently evidence of possession with the intent to distribute controlled substances and a conspiracy to possess with the intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846, as more fully described in Attachment B.

**A.      419 Furrow Street, Baltimore, Maryland 21223 ("SUBJECT PREMISES 1")**

47.      **SUBJECT PREMISES 1** is believed to be a location being used by the **TARGET SUBJECTS** to store narcotics.  The BGE account has no one listed.  A LexisNexis search has indicated that "Khyrie Baker" is the current resident of **SUBJECT PREMISES 1**.

48.      Between February and July 2019, investigators have seen **VAUGHAN** entering and exiting with narcotics or suspected narcotics several times.  For example, on April 11, investigators saw **VAUGHAN** leave **SUBJECT PREMISES 1** and hand another person a clear plastic bag containing objects consistent with the shape and size of street-level narcotics.

**VAUGHAN** also completed controlled purchases with the CI on May 1 and May 14 after exiting **SUBJECT PREMISES 1** with suspected crack cocaine.

49.    **VAUGHAN** has also arranged sales at that location.  On June 12, the CI and **ARNOLD SMITH** met **VAUGHAN** outside **SUBJECT PREMISES 1** so the CI could discuss purchasing an "eight ball" of "hard."

50.    Based on my training and experience and my participation in this and other investigations, I know that certain items, like documents, records, narcotics, and narcotics proceeds, are commonly maintained at associated residences of individuals involved in drug trafficking or the residences of their relatives or associates.  Given this and the evidence of **VAUGHAN**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISES 1**, the items set forth in Attachment B.

**B.    639 S. Pulaski Street, Baltimore, Maryland 21223 ("SUBJECT PREMISES 2")**

51.    **SUBJECT PREMISES 2** is believed to be the current residence of **SPENCER**. **SPENCER** is currently on probation and has listed his residence as **SUBJECT PREMISES 2**. **SPENCER** also lists **SUBJECT PREMISES 2** as his current address in Maryland's motor vehicle records.  Additionally, on February 13, June 12 and July 31, 2019, investigators saw **SPENCER** entering and exiting **SUBJECT PREMISES 2**.

52.    During the course of this investigation, investigators have seen **SPENCER** or other **TARGET SUBJECTS** travelling between **SUBJECT PREMISES 2** and the 400 block of Furrow Street.  As noted above, during the UC purchase of suspected heroin and fentanyl on July 31, 2019, **SPENCER** and **ARNOLD** travelled to **SUBJECT PREMISES 2** before returning to the UC and providing the suspected narcotics.

20

53.     In addition, based on my training and experience and my participation in this and other investigations, I know that certain items, like documents, records, narcotics, and narcotics proceeds, are commonly maintained at the residences of individuals involved in drug trafficking. Given this and the evidence of **SPENCER**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISES 2**, the items set forth in Attachment B.

C.     **2903 Lakebrook Circle, Apt. 303, Lansdowne, Maryland 21227 ("SUBJECT PREMISES 3")**

54.     **SUBJECT PREMISES 3** is believed to be the current residence of **VAUGHAN**. **SUBJECT VEHICLE 2** has been observed at the residence. A LexisNexis query has indicated that "Ceasar Vaughan" is the current resident. Additionally, on May 14 and May 22, 2019, investigators saw **VAUGHAN** leaving the apartment complex of **SUBJECT PREMISES 3**. **VAUGHAN** has also been seen leaving Apartment 303 during surveillance, and **VAUGHAN** used a key to lock the entry door of Apartment 303.

55.     As noted above, on several occasions during this investigation **VAUGHAN** has been observed travelling directly between **SUBJECT PREMISES 3** and the location of drug shop on the 400 block of Furrow Street.

56.     In addition, based on my training and experience and my participation in this and other investigations, I know that certain items, like documents, records, narcotics, and narcotics proceeds, are commonly maintained at the residences of individuals involved in drug trafficking. Given this and the evidence of **VAUGHAN**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISES 3**, the items set forth in Attachment B.

**D.**     **4109 Stokes Drive, Apt. 4, Baltimore, Maryland 21229 ("SUBJECT PREMISES 4")**

57.     **SUBJECT PREMISES 4** is believed to be the current residence of **ARNOLD SMITH**. **SUBJECT PREMISES 4** is listed on **ARNOLD SMITH**'s driver's license.

58.     Additionally, on June 27, 2019, investigators saw **ARNOLD SMITH** leave the ·apartment complex of **SUBJECT PREMISES 4** and travel to a controlled purchase of narcotics with the UC.

59.     In addition, based on my training and experience and my participation in this and other investigations, I know that certain items, like documents, records, narcotics, and narcotics proceeds, are commonly maintained at the residences of individuals involved in drug trafficking. Given this and the evidence of **ARNOLD SMITH**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT PREMISES 4**, the items set forth in Attachment B.

**E.**     **2015 BMW X3 bearing Maryland registration 4DP0981 ("SUBJECT VEHICLE 1")**

60.     A check of the Maryland Department of Motor Vehicles indicates that **SUBJECT VEHICLE 1** is registered to **SPENCER**.

61.     Between February and June 2019, investigators regularly saw **SPENCER** driving **SUBJECT VEHICLE 1**. Investigators also saw **SUBJECT VEHICLE 1** in close proximity to **SUBJECT PREMISES 2** on a regular basis.

62.     As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, like documents, records, narcotics, and narcotics proceeds at their residences or in their vehicles. Given this and the evidence of **SPENCER's** involvement in a narcotics trafficking conspiracy, I

respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 1** the items set forth in Attachment B.

**F.**   **2006 Infiniti G35 Coupe bearing Maryland registration 5DT9236 ("SUBJECT VEHICLE 2")**

63.   **SUBJECT VEHICLE 2** is believed to be the current vehicle of **VAUGHAN**.  A check of the Maryland Department of Motor Vehicles indicates that **SUBJECT VEHICLE 2** is registered to an entity named "Sykia Private Duty."  Investigators know that the first name of **VAUGHAN**'s wife is "Sykia."

64.   Between May and June 2019, investigators regularly saw **VAUGHAN** driving **SUBJECT VEHICLE 2**.  Investigators also saw **SUBJECT VEHICLE 2** in close proximity to **SUBJECT PREMISES 3** on a regular basis.

65.   As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, like documents, records, narcotics, and narcotics proceeds at their residences or in their vehicles.  Given this and the evidence of **VAUGHAN**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 2** the items set forth in Attachment B.

**G.**   **2005 Honda Accord bearing Maryland registration 6DW1328 ("SUBJECT VEHICLE 3")**

66.   Investigators believe that **ARNOLD SMITH** uses **SUBJECT VEHICLE 3**.  A check of the Maryland Department of Motor Vehicles indicates that **SUBJECT VEHICLE 3** is registered to "Denise Burgess" at **SUBJECT PREMISES 4**.  Investigators know that she is **ARNOLD SMITH**'s mother.

67.     On June 25, 2019, investigators saw **ARNOLD SMITH** drive **SUBJECT VEHICLE 3** to complete a controlled purchase of suspected crack cocaine with the UC and return in **SUBJECT VEHICLE 3** to the 400 block of Furrow Street.

68.     As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, like documents, records, narcotics, and narcotics proceeds at their residences or in their vehicles. Given this and the evidence of **ARNOLD SMITH**'s involvement in a narcotics trafficking conspiracy, I respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 3** the items set forth in Attachment B.

H.     **2010 Mercedes C300 bearing Maryland registration 4DP0978 ("SUBJECT VEHICLE 4")**

69.     A check of the Maryland Department of Motor Vehicles indicates that **SUBJECT VEHICLE 4** is registered to **SPENCER**.

70.     Between February and June 2019, investigators often saw **SPENCER** driving **SUBJECT VEHICLE 4**, whenever **SPENCER** was not driving **SUBJECT VEHICLE 1**. Investigators also often saw **SUBJECT VEHICLE 4** in close proximity to **SUBJECT PREMISES 2** or on or around the 400 block of Furrow Street. As noted above, on July 31, 2019, **SPENCER** and **ARNOLD** drove to and from the controlled purchase of narcotics in **SUBJECT VEHICLE 4**.

71.     As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, like documents, records, narcotics, and narcotics proceeds at their residences or in their vehicles. Given this and the evidence of **SPENCER**'s involvement in a narcotics trafficking conspiracy, I

24

respectfully submit that there is probable cause to believe that there will be found in **SUBJECT VEHICLE 4** the items set forth in Attachment B.

## CONCLUSION

72.     Based on the foregoing affidavit, I respectfully submit that there is probable cause to believe that the **TARGET SUBJECTS** are (a) distributing and possessing with the intent to distribute crack cocaine, and (b) conspiring to do so in violation of 21 U.S.C. §§ 841 and 846. I further submit that there is probable cause to believe that the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** are being used for the storage and distribution of narcotics, narcotics proceeds, narcotics-related documents, and the facilitation of narcotics offenses in violation of 21 U.S.C. §§ 841 and 846; and that there will be found in the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** evidence, fruits, and instrumentalities of the aforementioned violations.

73.     WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue arrest warrants for the **TARGET SUBJECTS** and search warrants for the **SUBJECT PREMISES** and **SUBJECT VEHICLES** more fully described in Attachment A-1 to A-8 , and authorize the search and seizure of the items described in Attachment B.

Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information, and belief.

Special Agent Colleen Daly
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

19-2585 BPG  19-2586 BPG  19-2587 BPG  19-2588 BPG
19-2589 BPG  19-2590 BPG  19-2591 BPG  19-2592 BPG
19-2593 BPG  19-2594 BPG  19-2595 BPG  19-2596 BPG

Subscribed and sworn to before me this _____6⁷ᵗʰ_____ day of _____August_____, 2019.

_____
The Honorable Beth P. Gesner
United States Magistrate Judge
District of Maryland

19-2598 BPG

19-2599 BPG